UNITED STATE DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ETIENNE TREPANIER-BOULAY,<br>Petitioner<br><br>v.<br><br>ZOEY GULMI-LANDY,<br>Respondent | )<br>)<br>)<br>)  CIVIL ACTION<br>)  NO. 3:13-CV-30039<br>)<br>)<br>) |

## RESPONDENT'S VERIFIED MOTION TO DISMISS PETITIONER'S PETITION FOR RETURN OF CHILD TO PETITIONER AND PETITION FOR IMMEDIATE ISSUANCE OF SHOW CAUSE ORDER TO RESPONDENT

### I. Introduction

Respondent, Zoey Gulmi-Landy ("Mother"), in the above-captioned matter, hereby submits this Motion to Dismiss Petitioner's Petition for Return of Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent, pursuant to Fed. R. Civ. P. 12(b)(1).

### II. Background

Mother and Petitioner ("Father") married on June 4, 2010, prior to which they had dated for approximately twelve (12) years. One child was born of their marriage, L.G-B ("Child"), who was born on August 16, 2011. Father is a professional football player in the Canadian Football League (currently he does not have a contract) as well as the co-host of a popular children's television show, Les Testeurs, and also for a morning television show, Ca Commence Bien, both of which is shot and airs in Quebec. He is also a media personality who is paid for appearances, and has numerous paid

1

sponsorships with local, provincial, national, and international companies. Mother is a stay-at-home mother to Child, prior to which she was most recently Father's agent and manager.

Throughout the parents' relationship, Father has been emotionally and verbally abusive and physically aggressive, including but not limited to pushing Mother, threatening her, punching walls, and the like, as well as controlled all finances and strictly restricted information about them. In addition, at least throughout Mother's pregnancy and continuing to this day, Father has had an acute substance and alcohol abuse problem, as well as a gambling addiction; specifically, Father is and has been abusing cocaine, narcotic pain killers and other prescription drugs without prescription, MDMA (a/k/a ecstasy), alcohol, marijuana, Ephedrine, and steroids. Though he received in-patient substance abuse treatment at a rehabilitation facility between September and October 2011, he quickly relapsed upon discharge, after which his behaviors and moods became increasingly unpredictable. As a result of this and his dangerous and intolerable decisions and lifestyle, including using drugs, steroids, and other substances as indicated above, around Mother and Child, and in the home and car, it became increasingly necessary for Mother to leave in order to protect her son and herself. As a result, Mother and Child have been living at her mother's home. Mother and Child have been financially supported by her mother as well.

Father's substance abuse, alcoholism, gambling, and the resulting depletion of the family's funds, combined with his abusive and threatening behavior, became so acute that an intervention was staged several weeks after Child's birth, after which he entered an in-patient substance abuse treatment and rehabilitation facility. Upon his entrance in

2

September 2011, Mother and Child, then just six weeks old, moved in with Respondent's mother in Massachusetts. Just over one week after his discharge, Father relapsed, and fell back into his prior patterns. Because of Father's dangerous activities, Mother and Child again returned to Massachusetts in early November. Some of the factors involved, though certainly not limited to, keeping drugs and syringes inside the home, and at times on the floor, staying out all night – at which time he would either drive back to the house, under the influence, or he would go missing and Mother would send for someone to find him, e.g., on the side of the road. The Mother and Child continued to travel between the two homes for the remainder of 2011, with a majority of the time spent in Massachusetts. This pattern continued into the new year, leading Mother and Child to move to Massachusetts at least late January or early February 2012. In the subsequent months, Mother and Child traveled between Massachusetts and Quebec, as Mother attempted to discuss parenting issues arising out of the marriage as well as to provide visitation, at which she was always present, to Father. These trips would typically end upon Father engaging in reckless behavior, including excessive drinking, partying, gambling, and abusing illegal substances in a significant and dangerous manner, as well as being verbally and emotionally abusive and aggressive. This would lead to Mother determining that it was not safe for her and Child to remain with Father. At that point, Mother would tell Father that they could not and would not live with Father anymore, given his dangerous and destructive behaviors, and Father would agree that Mother should take Child and go to her mother's house in Massachusetts. He would often help get them ready. Father never requested that Mother leave the Child with him; instead, he

3

frequently encouraged her to take the Child and leave, even forcing them to do so, as on Mother's Day 2012, when Father kicked Mother and Child out of the house.

On each occasion, Father consented or acquiesced to Mother and Child leaving, for an indefinite period of time. Father always knew where Mother and Child were going, that is, to her mother's house in Massachusetts.

On those occasions when Mother and Child were in Canada, Mother often had family members come up when possible for support. When Mother went there for a previously-scheduled event (e.g., several weddings and showers), she often arranged for one of her family members to travel to Canada watch the Child. Father did not asked for time with the Child, and was not around enough to spend much time with Child, as he was out of the house most of the time, or asleep, due to his substance abuse and late partying. Father has only ever been alone with the Child on a handful of occasions, and even then, only for an hour or two.

This pattern continued until July 2012, in or about; from July 2012 to the present, Mother and Child have only visited Father twice, both short visits, the last time in early September 2012. These visits ended the way that previous visits had, that is, with Father's abusive and dangerous behavior and activities, including drug and alcohol use. The Mother facilitated video "chats" with the Child and Father, though they ended when Father abruptly cut off all communication with Mother and Child on or about December 10, 2012. Mother and Child have not heard from Father, except through lawyers, since approximately December 2012, save for a few emails sent to Mother from Father, copied to his lawyers, demanding information or items. The Father has made no affirmative

attempts to contact his son, and has in fact rebuffed Mother's numerous offers of visitation with Child.

As a result, the Child unfortunately has no relationship with Father, and in fact, Child does not know or recognize Father. The Child is very attached to his Mother, whom he has never been away from for more than a few hours (at which time he is cared for by a member of Mother's immediate family) and his maternal relatives and is happily engaged in his community. The Child attends a number of playgroups and Church groups, and has several friends with whom he has play dates. Child also attends a number of enrichment classes every week. His pediatrician is in Northampton, and he is receiving MassHealth medical benefits. Child is a dual citizen of Canada and the United States, and possesses a United States passport, and all other US citizenship documentation, most of which required Father's permission to obtain.

After a series of failed attempts by Mother to amicably address divorce and custody issues, Mother filed for divorce and custody in the Hampshire Probate and Family Court in Northampton, on October 30, 2012. Father was served but did not appear nor have counsel appear for him until February 28, 2013, when counsel entered a special appearance. Mother was granted temporary sole legal and physical custody of the Child by Order of the Hampshire Probate and Family Court (Fidnick, J.), on January 7, 2013. In that Order, the Father was granted supervised visitation, something he has not even arranged, let alone exercised.[1]

---

[1] While reserving all responses and rights to answer the Petition, and assert affirmative defenses and responses, Mother states that Father's request for immediate access to the Child and his statement that he requires a show cause order in order to have "proper contact" with Child is therefore disingenuous at best. As noted, Mother has consistently and repeatedly offered Father visitation, and there is now a Court Order providing him with supervised visitation. There is an adequate visitation procedure set forth in said Order, and there is certainly no need for the provisional remedies he now requests of this Court. Father has not

5

While Mother reserves the right to respond to the Petition, she states, without waiving any responses or affirmative defenses, that she is not a flight risk, contrary to Father's assertions in said Petition. Mother has always been connected to Williamsburg, Massachusetts; indeed, this is the home she grew up and where her family is located. Mother and Child have been living in Williamsburg the entire time, without any concealment of the Child whatsoever – in fact, Mother has repeatedly attempted to encourage Father's involvement in Child's life. Given that Father has not provided Mother with any support or financial assistance, and Mother and Child are dependent on her mother for all of their support and needs, Mother would not even have the financial ability to be anywhere other than with her mother.[2]

### III. Discussion

#### (a) The Hague Convention/ICARA Does Not Apply, Therefore the Court Lacks Subject Matter Jurisdiction

As a threshold matter, there has been no "wrongful removal" or "wrongful retention," and therefore, neither the Hague Convention ("Convention") nor the International Child Abduction Remedies Act ("ICARA"), 42 USC §11601-11610, applies, and this Court lacks subject matter jurisdiction. Therefore, this matter should be dismissed.

A removal or retention of a child is considered to be "wrongful" in the meaning of the Hague Convention where,

---

only failed to take any affirmative action to contact Child, but he has also actively avoided all offers and opportunities for such contact.

[2] Mother also notes, again, without any waiver and while reserving all rights to answer the Petition and assert her affirmative defenses and responses, that Child was not born until August 16, 2011, and therefore was not residing anywhere "since April, 2007," as the Petitioner avers.

6

> "(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal and retention."

Convention, Article III.

As will be discussed, Mother neither wrongfully retained nor wrongfully removed the Child from Quebec, as that was not his place of habitual residence.

The first step requires a determination of the child's place of habitual residence, as "'[a] key prerequisite to exercise of jurisdiction under the Convention is that the child be removed or retained from its habitual residence.'" Falls v. Downie, 871 F.Supp. 100, 102 (D. Mass., Ponsor, J., 1994) (quoting Ponath v. Ponath, 829 F. Supp. 363, 365 (D. Utah, C.D., 1993)). That is, "[r]emoval or retention of a child can be wrongful only if the removal or retention is from the habitual residence of the child." Levesque v. Levesque, 816 F. Supp. 662, 665 (D. Kan. 1993); see Falls v. Downie, 871 F. Supp. 100, 102 (D. Mass. 1994). The time that the court reviews when determining the child's habitual residence is that period immediately prior to the alleged "wrongful removal or retention." Zuker v. Andrews, 2 F. Supp. 2d 134, 136 (D. Massachusetts 1998) ("Thus, the question with respect to 'habitual resident' [sic] is tied to that period of time 'immediately before' the retention." ).

Thus, the time that the "retention" or "removal," if any, became "wrongful," if at all, must be determined, in order to determine the child's habitual residence. For the reasons discussed as follows, the Child herein was never "wrongfully removed or retained," since his habitual residence was Massachusetts. Even if the court looked to the Father's date of alleged "wrongful removal or retention," if any,

7

were found to be September 2012, as Father alleges, Child's habitual residence would remain Massachusetts.

In the present matter, as previously discussed, Father consented or acquiesced to every occasion. In such a circumstance, the Child's place of habitual residence can shift, given the parents' mutual intent, discussed infra.

In the case at hand, the Child traveled back and forth for a time and settled in Massachusetts, with Father's consent or acquiescence, in or about January-February 2012. Prior to that, given the Child's very tender age and the turmoil in the family, the Child's habitual residence was not established until his settlement in Massachusetts with his Mother, with the consent and acquiescence of his Father. Mother and Father reached agreement and "settlement of purpose" necessary that there was "an intent to remain, at least for a period of time which was indefinite … by mutual agreement." Levesque, 816 F. Supp. At 667.

The Child never established a habitual residence in Canada. Indeed, approximately one month after his birth, his Father entered a rehabilitation center and the Child and his Mother moved to Massachusetts. Thereafter, as set forth briefly above, the Child and Mother traveled back and forth between Canada and Massachusetts to escape Father's dangerous lifestyle and behavior. While Mother received Father's consent or acquiescence, the Child was not being moved from his habitual residence, and therefore, it could not be "wrongful" within the meaning of the Convention and ICARA. See, e.g., Kijowska v. Hanes, 463 F. 3d 583, *10-14 (7th Cir. 2007).

8

There are at least two additional alternate bases for this conclusion, that the Child's habitual residence was and is Massachusetts. The Child could have acquired a habitual residence in Massachusetts earlier. Alternatively, even if the Petitioner could prove that the Child obtained a habitual residence in Quebec at birth, which Mother denies, there is no doubt that at the time that Petitioner alleges a "wrongful retention or removal," September 2012, his habitual residence was Massachusetts. See, e.g., Zuker v. Andrews, 2 F. Supp. 3d 134 (D. Mass. 1998). In fact, Child was well-settled in his Massachusetts habitual residence for over a year.

Petitioner already agreed to the Child's habitual residence, and now the Child is well settled in his home and community. See, e.g., Mozes v. Mozes (9th Cir. 2001). In any event, the Child's habitual residence was either (a) always Massachusetts, or (b) Quebec, though shifted by mutual agreement and intent to Massachusetts, where there is a "'settled purpose.'" Falls, 871 F. Supp. 100, 102 (D. Mass. 1994).

### *Mutual Intent*

The determination of the Child's place of habitual residence is directly connected to Father's consent and acquiescence. In this case, the Father consented and agreed to numerous trips of indefinite duration, a type of acquiescence or consent, well supported by case law, from which habitual residency emerges.

In Father's Affidavit to his Application, attached to the instant Complaint, he presents his arguments, but in fact further demonstrates his consent/acquiescence, since he does not claim that he was not in agreement with this travel of indefinite duration and

provide his consent. Indeed, Father did consent and acquiesce to it, even proving Mother with travel authorization documents to allow her to travel without Father over the border. Without addressing or waiving arguments as to the veracity of the Affidavit, on its face it provides evidence sufficient to find that the relocations led to a change in the Child's place of habitual residence (this is true despite the fact that the Affidavit is internally inconsistent and contains a number of false statements). As to one of the allegations, Father states that mother left Canada with the Child to go to the United States to her family's house in Williamsburg, Massachusetts; further, that Mother "didn't precise [sic] the length of the visit ... But, usually, she stays there for two or three weeks maximum."

This has been repeatedly found to be evidence of a shared intent to consent to relocation and often a resulting shift in habitual residence. "Surely any case where a child is removed from one country to another country with the consent and acquiescence of the other parent, a residency change can result, thus changing the habitual residence of the child." Schroeder v. Vigil-Escalera Perez, 76 Ohio Misc. 2d 25, 33 (1995). In that case, the court found that the father had knowledge at all times of his infant child's whereabouts, that he had failed to provide any support to mother or child, and in fact, that he "did not even acknowledge [child's] first birthday…" Id. at 631. A habitual residence can be established in a short amount of time, in the right circumstances. For example, in Falls, the Court found that a two-year-old child had been living in the United States with his mother's agreement for 8 months, during which time, "[h]e had become completely accustomed to life in this country with his father and grandparents; he barely knew his mother." Falls, 871 F. Supp. at 102. Therefore, the Court wrote, "[i]t simply defies common sense to suggest under these circumstances that [the Child] was, as of that date,

10

a 'habitual' resident of Germany. In every significant respect, the boy had by August 1994 settled with the consent of his mother indefinitely in this country." Id. Likewise, in the instant matter, the child does not know his father, though on the other hand, he is extremely bonded and attached to his extended family and to his life in Massachusetts. This case is a very close parallel to the case at bar. The Child is well- and "sufficiently settled," in "every significant respect," in Massachusetts so that it is the child's habitual residence. Id. A child's young age, as in Falls and the Child herein, supports a finding both of the ability to adapt a habitual residence is a relatively short period of time, and the loss of a former habitual residence, if any, and connections thereto (such as to a parent in both situations). Id. at 102; see Zuker v. Zuker, 2 F. Supp. 2d 134, 138 (D. Mass. 1998) (discussing cases in which there is mutual agreement to at least a trip of uncertain duration, including Falls); Schroeder v. Vigil-Escalera Perez, 76 Ohio Misc. 2d 25, 33 (1995). No matter the date that Father alleges Child was "wrongfully removed/retained," the Child's habitual residence was Massachusetts, under either analysis set forth above.

Likewise, in Levesque v. Levesque, 816 F. Supp. 662 (D. Kansas 1993), the court found that the child's habitual residence changed where the parents, by mutual agreement, had an intent for the mother and child to "remain, at least for a period of time which was indefinite." Of note, the court wrote, that even if the father had been misled about the trip, as he asserted, and believed that it would be a short in duration, the trip was nonetheless "agreed to," with both parents agreeing that the child would go with mother to Germany "for some period of time. ... The amount of time was left open," and the father agreeing that the child should go with the mother. This caused a shift in the

11

child's habitual residence, as it "amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled." The court noted as well that the mother had not concealed where she and the child were located, and had even made arrangements to facilitate contact with the father and child.

In Zuker v. Zuker, 2 F. Supp. 2d 134 (D. Mass. 1998), the court found that, although the parents' expectations "differed," as to how long the child would remain in the receiving state (the United States), nonetheless, "their remaining here [in the US] was in substance the subject of a tacit agreement, or at least an acquiescence on [Father's] part." Id.

In Kijowska v. Haines, 463 F.3d 583 (7th Cir. 2006), the court decided a case in which a child was born in the United States, and subsequently moved by her mother at two months of age to Poland, where she remained for six months (child was a dual citizen). Thereafter, mother and child returned to the US for a visit with father, who proceeded to abduct the child. The court found that an analysis of habitual residence based on the "shared intent" of the parents would "not work when as in this case the parents are estranged essentially from the outset, the birth of the child (or indeed before)." The court determined that during the two months the child was in the US (her first months of life), the child "could not be said to have acquired a 'habitual' residence." Id. Rather, the court decided that the child's time in the United States as an infant was not enough to find that she had established a habitual residence separate from her mother. Id. at *7-11 (mother's habitual residence was found to be Poland). While the court stated that this did not mean that an infant's residence is automatically that of its mother's, due to the implications that would mean for the Convention, it could not square the opposite

12

result, with, in part, the father's expectations and understanding and the reality of their situation. Id. The court also found that it would have reached the same result on an alternate theory, specifically, that the child had no habitual residence as of the alleged wrongful removal. Id. at *14. In that case, there could be no wrongful removal, and the subsequent acquisition of a habitual residence was "unproblematic." Id. at 15. As in Kijowska, the Child did not acquire a habitual residence in the approximately six weeks he was in Canada prior to his Father's entry into a rehabilitation facility, at which time he and Mother relocated to Massachusetts, and as such, there was no wrongful removal and his subsequent acquisition of Massachusetts as his habitual residence was likewise "unproblematic."

Also in Kijowska v. Haines, the court found that a child born in the US, where she lived for her first two months of life, and thereafter lived in Poland with her mother for approximately the next six months, was a habitual resident of Poland. Id. at *9. The court found support for this finding, in part, from the fact that the child had "lived in Poland for most of her life at that point," that her mother, her "primary caretaker," did not at that time possess proper immigration status in the United States, and that the child's half-sister, "with whom [the child] evidently had a close relationship," was also a citizen of Poland. Id. As a result of these factors, the court noted that "keeping [the child] in the United States, as [father] did, removed her from the family and social environment in which her life had developed." Id. (citing Koch v. Koch, 430 F.3d 703, 711 (7th Cir. 2006)).

This case is particularly important to the understanding of the matter at hand, where the Child has no ties to Quebec, Canada, and significant ties, indeed all ties that he

13

has formed thus far in his life, in Massachusetts. As in Kijowski, the Child has no connection to Quebec, where he has never been or lived for more than a short time. Id.; see also In re Wojcik, 959 F. Supp. 413, 421 (E.D. Mich. 1997) (finding that the children were well-settled in their new environment; discussion of connections to extended family and community, in contrast to the father's family in France, which the court found to be "indifferent to the children at best.").

### Additional Threshold Issue: The Petitioner was not Exercising Custody Rights and Petitioner Abandoned the Child. Therefore, this Court Lacks Subject Matter Jurisdiction.

The Convention/ICARA's return remedy can be exercised, if at all, only where there is a breach of custody rights that were actually exercised at the time of the allegedly wrongful removal or retention, or would have been but for the removal or retention. Convention, Article 3(b); see also Convention, Article 13(a) (same, though as a defense to the return of the child).

In the instant case, the Father has never had actual physical custody of the Child, and never cared for him, and thus, he cannot have "actually exercised" his custody rights. In fact, the Father has only ever been with the Child on very few occasions, and the Child does not know the Father. The Father effectively abandoned the Child through his excessive abuse of substances, such that he was not physically present nor was it possible for the Child to be present with him. Subsequently, he also abandoned the Child by moving to Toronto alone in or about July 2012. See also Schroeder v. Vigil-Escalera Perez, 76 Ohio Misc. 2d, 25 (1995). In a parallel situation to the case at hand, the court in Schroeder held, "[t]he fact that defendant has made no effort to see or visit with the

14

minor child, although encouraged by the plaintiff to do so, is further evidence that the defendant acquiesced in the retention of the child in the United States." Id. at 633. In the current action, as in Schroeder, the Father has also neither affirmatively sought to contact or see Child, nor has he even engaged in or accepted the multiple opportunities Mother, and now the Hampshire Probate and Family Court's Temporary Order, have provided. Mother has consistently attempted to arrange appropriate contact between Father and Child. She has on countless occasions, over all of Child's life, arranged and offered contact. She has sent countless emails and text messages, and had countless conversations in an attempt to get Father to contact the Child, but to no avail. He has also failed to exercise his right to supervised visitation under the Probate and Family Court Temporary Order. As in Schroeder, Father's failure to visit or contact the Child should be deemed further evidence of his "acquiesc[ence] in the retention of the child in the United States." Id.

The Father has also failed to plead facts sufficient to demonstrate that the relocation of the Child was in violation of his custody rights. See, e.g., Exhibit D to Petitioner's Complaint; Shalit v. Coppe, 182 F.3d 1124, 1131 (9th Cir. 1999) (declining return of child to habitual residence where the Petitioner had failed to demonstrate that Respondent's retention of the child was in violation of his custody rights).

Finally, "[t]wo important and closely related principles underlying the Hague Convention also inform our approach here. First, a court deciding a petition for return of a child plainly has jurisdiction to decide the merits of a wrongful removal claim, but it may not decide the merits of the underlying custody dispute. Second, the Convention is generally intended to restore the pre-removal status quo and discourage a parent from

15

crossing international borders in search of a more sympathetic forum." Whallon v. Lynn, 230 F.3d 450 (1st Cir. 2000) (citations omitted).

The child in the instant action can hardly be said to be restored to the "status quo" by being sent to Canada, where he has never been for long enough to establish any sort of "status quo." In the same vein, there is no possible "international forum shopping" occurring in the case of the Respondent. Rather, she fled to Massachusetts in order to protect her child and herself. She felt she had no other options as she has no other connections. The Petitioner has always understood that this was first a possibility and then a reality. He accepted that, and in fact encouraged it. It is unfair for him to now be allowed to change his mind and demand their presence, as they have now settled into their lives, with his consistent acquiesce, encouragement, and understanding, such that it has become the Child's place of habitual residence.

Doctrine of Forum Non Conveniens

Petitioner is forum-shopping, in order to avoid having to appear before the Judge in the open and active proceeding pending in the Hampshire Probate and Family Court. Since ICARA grants jurisdiction to state courts as well as Federal courts, there is no valid reason why Petitioner is now bypassing the ongoing custody proceeding in a court that appropriately has subject matter jurisdiction.

## III. CONCLUSION

For the reasons set forth herein, the Respondent respectfully requests that this Court <u>deny</u> all of Petitioner's requested relief, and dismiss the Petition, allowing the

Hampshire Probate and Family Court determine the issue of custody, a process that has already begun.

RESPONDENT REQUESTS A HEARING ON THIS MOTION

Verified as to facts herein and sworn to under the pains and penalties of perjury.

*[signature]* 3/19/13

Dated: March 19, 2013

Respectfully submitted,

ZOEY S. GULMI-LANDY
By her Attorney,

*[signature]*

Bernadette Stark
Dinsmore Stark, Attorneys At Law
76 Masonic Street
Northampton, MA 01060
Ph: (413) 259-6874
Fax: (413) 259-1101
BBO#: 650736

## Certificate of Service

I hereby certify that this document filed through the CM/ECF system will be sent electronically, as well as via first-class mail, postage pre-paid at the address listed below, to the registered participants as identified on the NEF (NEF). Further, paper copies will be sent to any of those indicated as non-registered participants on March 19, 2013.

Mark I. Berson
345 Main Street, Suite 2N
Greenfield, MA 01301-1538

Dated: March 19, 2013

Bernadette Stark, Esq.